UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA,

              v.                       24-cr-515 (JSR)

ALEXIS ANTONIO DIAZ,                   MEMORANDUM ORDER

              Defendant.
```

JED S. RAKOFF, U.S.D.J.:

Defendant Alexis Antonio Diaz moves to suppress evidence collected from the execution of two search warrants. See ECF Nos. 10, 12. Diaz faces two criminal charges: conspiracy to distribute narcotics (Count One) in violation of 21 U.S.C. § 846, and narcotics possession with intent to distribute (Count Two) in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A), and 18 U.S.C. § 2. See ECF No. 1. A grand jury indicted Diaz on both counts in August 2024. See ECF No. 4.

Although Diaz challenges two distinct search warrants, the factual background relevant to evaluating probable cause is the same for both warrants. Since August 2024, the Drug Enforcement Administration ("DEA") had been investigating a particular store where it believed "cut" -- substances added to drugs "to reduce the potency of illegal narcotics" -- was sold. Ex. 1 to Def. Mem. of Law at 4 ¶ 5. On August 13, 2024, an undercover officer visited the store. Id. at 4 ¶ 6. Posing as a prospective purchaser, he

1

explained to an employee ("Employee 1") that he wanted to purchase cut; Employee 1 then called a coworker ("Employee 2"), who asked the undercover officer about the kind of drug he intended to cut. Id. at 4 ¶ 6(a). The officer responded that he wanted to cut "coke," and Employee 2 sent Employee 1 to retrieve the cut. Id. Employee 1 left the store, entered a shed down the street, and exited the shed with a "weighted black plastic bag." Id. at 4 ¶ 6(b). When Employee 1 returned to the store, he handed the bag to Employee 2, and Employee 2 and the officer discussed the price of the cut. Id. at 5 ¶ 6(c). The officer left the store without making a purchase. Id.

On the following day, in the course of their surveillance, officers observed an individual ("Co-conspirator 1"), who was carrying a teal bag, enter the store. Id. at 5 ¶ 7(a). Soon after, Employee 1 exited the store, entered the shed, and returned to the store with a weighted black plastic bag. Id. When Co-conspirator 1 left the store, an officer spotted "a black plastic bag sticking out from the teal bag." Id. Co-conspirator 1 eventually entered an apartment building and stopped at the door of Apartment 1E. Id. at 5 ¶ 7(c); see also id. at 3 ¶ 3.

Officers approached Co-conspirator 1, identified themselves as law-enforcement officers, and again noticed "a black plastic bag sticking out of the teal bag." Id. at 5 ¶ 7(d). The officers then told Co-conspirator 1 that "they were looking for a person

2

who assaulted a child and asked . . . who was inside" the apartment. Id. at 5 ¶ 7(d). Co-conspirator 1 responded "that no one was inside" but offered to "call the owner." Id. He made a video call and "stated that the police were there looking for a person who assaulted a child." Id. at 6 ¶ 7(d). Not long after, an officer stationed at the back of the building saw two individuals crawl out of the apartment's window and climb onto the fire escape. Id. at 6 ¶ 7(e). One of the individuals ("Co-conspirator 2") successfully fled, but Diaz was arrested. Id. When the other officers were alerted to the flight of the apartment's occupants, Co-conspirator 1 escaped with the teal bag. Id. at 6 ¶ 7(f).

On the same day, a Special Agent with the DEA applied for a search warrant for the apartment. See id. at 1-2. In support of the application, the Agent submitted an affidavit outlining the DEA's investigation of the store and the events of August 14, 2024. See id. at 4-6. A magistrate judge issued the search warrant. See id. at 1, 13-14. When officers executed the search warrant, they discovered substances that later tested positive for fentanyl, as well as equipment used to weigh, press, and package narcotics. ECF No. 1 at 2 ¶ 8(a). The weight of the narcotics found in the apartment was at least 5.5 kilograms. Id. at 4 ¶ 9. Other items indicated that the apartment belonged to Diaz, including keys to the front door with the name "Alexis" on the tag, a Dominican passport for "Alexis Antonio Diaz," and a check listing "Alexis

3

Antonio Diaz" as the payee and the apartment's address on the check's memo line. Id. at 4 ¶ 8(e)-(f).

The following month, the DEA Special Agent applied for another search warrant. See generally Ex. 1 to Def. Suppl. Mem. of Law at 1. Specifically, the Agent sought to search electronically stored information ("ESI") on an iPhone seized from Diaz at the time of his arrest. Id. at 3 ¶ 3. In addition to citing the factual background outlined in the Complaint (and just described), the Agent pointed out that after Co-conspirator 1 made the video call to the apartment's owner, both Diaz and Co-conspirator 2 attempted to escape from the apartment's window. Id. at 4-5 ¶ 10. He posited that the video call was placed either to Diaz's cellphone or Co-conspirator 2's cellphone. Id. at 5 ¶ 10. The Agent added that, based on "[his] training and experience and [his] familiarity with this and other narcotics trafficking investigations," he believed Diaz's cellphone likely contained evidence related to the distribution conspiracy. See, e.g., id. at 7-8 ¶¶ 13-16. A magistrate judge issued the warrant. See id. at 1.

To state the Court's general conclusion first, both warrants were supported by probable cause. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[P]robable cause is a flexible, common-sense

4

standard." Texas v. Brown, 460 U.S. 730, 742 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). This Court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238-39 (cleaned up). In other words, the Court "must accord considerable deference to the probable cause determination of the issuing magistrate." Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007). "A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." Gates, 462 U.S. at 236 (cleaned up).

Starting with the search warrant for the apartment, the facts substantially support the magistrate judge's probable-cause determination. Officers were familiar with the store's procedure for selling cut: Employee 1 visited the shed and returned with a weighted black bag. Employee 1 followed this routine when Co-conspirator 1 visited the store. Officers then observed Co-conspirator 1 leave the store with a similar weighted black

5

bag. When they stopped Co-conspirator 1 at the apartment's front door, he made a video call to its inhabitants, which precipitated their flight. Taken together, Co-conspirator 1's possession of a bag that likely contained cut and the actual flight of Diaz and Co-conspirator 2 in response to Co-conspirator 1's call yield a "fair probability" that "evidence of a crime" would be found in the apartment. Indeed, plain common sense -- the north star of the probable-cause inquiry -- prompts the rational conclusion that drug-related activity occurred in the apartment.

Diaz's arguments to the contrary disregard the kind of practical decision that an issuing magistrate must make. Specifically, Diaz argues that "nowhere in the search warrant affidavit does the agent make the claim that law enforcement had any specific knowledge of drug trafficking activity going on at the store or at the apartment." Def. Mem. of Law at 8. The Fourth Amendment does not impose such a demanding standard: probable cause requires only a "fair probability," not "specific knowledge." And for the reasons already described, the warrant affidavit outlined facts giving rise to a fair probability that drug-trafficking activity was happening in the apartment. Likewise, Diaz's argument that "the warrant affidavit does not sufficiently link" potential drug-trafficking activity at the store to the apartment both misconstrues the magistrate judge's inquiry and discounts the logical conclusion supported by the facts presented in the warrant

6

affidavit. See id. at 9. As explained, the Government identified specific facts that suggested that Co-conspirator 1 -- who also fled the scene -- likely purchased cut at the store for use at Diaz's apartment. The Government was not required to conclusively prove the connection for the search warrant to issue.[1]

Diaz appears to acknowledge that his challenge to the search warrant for ESI on his cellphone rises or falls with the Court's resolution of his suppression motion challenging the search warrant for the apartment. See Def. Suppl. Mem. of Law in Reply at 3 ("As a threshold matter, whether the cellphone search warrant was supported by probable cause turns on the outcome of Mr. Diaz's November 14, 2024 motion to suppress."). Indeed, if the evidence collected in the apartment during the execution of the first search warrant is admitted, Diaz's involvement in the drug conspiracy is clear. Courts in this district have routinely found probable cause

---

[1] Diaz raises additional arguments to which he devotes less attention. He contends that a probable-cause finding in this case would mean that anytime a suspect momentarily stops in front of an apartment door with drug-related supplies, law-enforcement officers would have probable cause to search that apartment. Def. Mem. of Law in Reply at 4. This argument ignores the fact that Diaz and Co-conspirator 2 fled upon learning that officers were outside the apartment. (Co-conspirator 1 fled too.) Diaz responds that the co-conspirators' flight does not suggest that drug-trafficking activity was occurring because officers had stated that they were investigating a child assault. Id. at 6. To be sure, the officers did not announce that they believed Co-conspirator 1 was delivering supplies for a narcotics conspiracy; but their permissible use of deception in no way negates their reasonable conclusion that the suspected drug activities continued to the apartment.

7

to search the cellphone of a defendant implicated in a narcotics conspiracy. See, e.g., United States v. Hoey, No. 15 Cr. 229, 2016 WL 270871, at *9 (S.D.N.Y. Jan. 21, 2016) ("Courts have commonly . . . found probable cause to search cellphones possessed by defendants arrested in connection with ongoing drug-distribution crimes based on the experience of agents familiar with narcotics trafficking that traffickers commonly use cellphones to communicate in the course of their narcotics distribution, as well as to store relevant information, including the names and contact information of suppliers, purchasers, and confederates."); see also id. (collecting cases).

Still, Diaz argues that the warrant affidavit did not establish a "sufficient nexus" between Diaz's cellphone and the alleged criminal activities. Def. Suppl. Mem. of Law at 11. Context and common sense undercut Diaz's argument. Diaz fled the hub of a sizable drug operation when he learned law-enforcement officers were outside. The video call itself -- even if placed to Co-conspirator 2 and not to Diaz -- indicates that the conspiracy relied on cellphones to communicate.

It remains only to add that even if (contrary to fact) Diaz were correct that the search warrants were not supported by probable cause, the good-faith exception would apply. The good-faith exception allows unlawfully obtained evidence to be used at trial "when the Government acts with an objectively reasonable

8

good-faith belief that their conduct is lawful." United States v. Zodhiates, 901 F.3d 137, 143 (2d Cir. 2018) (cleaned up). The Government has thus been allowed to rely on unlawfully obtained evidence where, as relevant here, an officer acted with "reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984). The key question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 922 n.23.

Diaz argues that this case mirrors a situation in which the good-faith exception often does not apply: "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable." United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992); see also Def. Mem. of Law at 10-11; Def. Suppl. Mem. of Law in Reply at 6-7. But given the Court's own evaluation of probable cause in this case (and the magistrate judges' determinations below), it is difficult for the Court to understand how a well-trained officer should have able to recognize that probable cause was clearly absent. Indeed, the Second Circuit has observed that the good-faith exception is appropriate for resolving suppression motions when probable cause presents a close question. See, e.g., United States v. Cancelmo, 64 F.3d 804, 808 (2d Cir. 1995) ("Application of the good faith exception is particularly appropriate in the instant case because the legal

9

question of whether probable cause existed is a close one."). The question is not so close here, but -- for the sake of thoroughness -- the Court concludes that the good-faith exception would apply.

For the foregoing reasons, defendant's motions to suppress are denied, and the Clerk of Court is respectfully directed to close docket entries 10 and 12.

SO ORDERED.

Dated:   New York, NY
         January 24, 2025                   JED S. RAKOFF, U.S.D.J.